## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

CASE NO.: _____

HOME INSTEAD, INC.,

      Plaintiff,

vs.

BIDWELL HOME CARE SERVICE, LLC;
BIDWELL SERVICE CARE, LLC;
WILLIAM BIDWELL; SUSAN BIDWELL;
BIDWELL CARE HOLDINGS, INC. d/b/a
SEASIDE HOME HEALTH;
JOSEPH BIDWELL; and
AUDRA ILER-BIDWELL,

      Defendants.

_____/

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Home Instead, Inc. ("Home Instead") sues Defendants Bidwell Home Care Services, LLC ("Bidwell Home"), Bidwell Service Care, LLC ("Bidwell Service"), William Bidwell ("W. Bidwell"), Susan Bidwell ("S. Bidwell"), Bidwell Care Holdings, Inc. ("Seaside"), Joseph Bidwell ("J. Bidwell") and Audra Iler-Bidwell ("Iler-Bidwell") (collectively "Defendants") and states:

1.     This is an action by Home Instead to stop its former franchisees, their owners, their competing business and other individuals (including family members), who conspired together, from using Home Instead's trademarks and

confidential information to divert Home Instead's business in violation of in-term and post-term restrictive covenants and numerous other terms of the parties' agreements. Home Instead is also seeking to recover the substantial damages it has already suffered and will continue to suffer as a clear result of the Defendants' wrongful conduct.

2.  Defendants, through their conduct, have made clear that without a court order, they will continue to engage in trademark infringement to deceive customers and they will otherwise continue to violate the clear terms of the parties' agreements. Defendants' wrongful conduct must be put to a stop.

## THE PARTIES

3.  Plaintiff Home Instead is a Nebraska corporation with its principal place of business in Omaha, Nebraska.

4.  Defendant Bidwell Home is a Florida limited liability company with its principal place of business in Fort Myers, Florida. Defendants W. Bidwell and S. Bidwell are Bidwell Home's only members.

5.  Defendant Bidwell Service is a Florida limited liability company with its principal place of business in Punta Gorda, Florida. Defendants W. Bidwell and S. Bidwell are Bidwell Service's only members.

6.  Defendant W. Bidwell is a resident of and domiciled in Naples, Florida.

7.     Defendant S. Bidwell is a resident of and domiciled in Naples, Florida. Bidwell Home, Bidwell Service, W. Bidwell and S. Bidwell shall be referred to collectively as the "Franchisee Defendants."

8.     Defendant Bidwell Care Holdings, which does business as "Seaside," is a Florida corporation with its principal place of business in Fort Myers, Florida.

9.     Defendant J. Bidwell is a resident of and domiciled in Bonita Springs, Florida.

10.     Defendant Iler-Bidwell is a resident of and domiciled in Bonita Springs, Florida.

11.     J. Bidwell and Iler-Bidwell are the owners of Seaside.

## <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction over this action based upon:

(a)     Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1337, and 1338(a), for the claims arising out of Defendants' violations of Sections 32, 43(a) and 44 of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and 1126;

(b)     28 U.S.C. § 1332(a)(2), as complete diversity exists between Home Instead and Defendants, and the amount in controversy exceeds $75,000; and

(c)     28 U.S.C. § 1338(b), and the doctrine of supplemental jurisdiction as codified in 28 U.S.C. § 1367, for the claims arising out of Defendants'

breaches of contracts and common law unfair competition.

13.     Venue for all claims against all Defendants is proper in the Middle District of Florida because a substantial part of the events or omissions giving rise to the claims occurred in and around Punta Gorda, Florida, Naples, Florida and Fort Myers, Florida.

14.     Venue for all claims against all Defendants is further proper in the Middle District of Florida because Defendants all reside in this District and are all subject to this Court's personal jurisdiction with respect to the claims asserted herein.

## THE HOME INSTEAD MARKS

15.     To identify the source, origin and sponsorship of Home Instead's services, Home Instead has extensively employed, caused to be advertised and publicized throughout the United States certain distinctive symbols as trademarks and service marks (the "Marks").  Home Instead owns and was the first to adopt and use the Marks as trademarks and service marks and all right, title and interest in and to the Marks remains vested solely in Home Instead in Omaha, Nebraska.

16.     Home Instead franchises businesses throughout the United States using the Marks on and in stores, on uniforms, in marketing material and on other items in advertising to the public through radio, television, print media, the internet, and social media.

17.    Set forth below is an abbreviated listing of the Marks registered to Home Instead in the United States Patent and Trademark Office:

| Trademark | Status | Application Date | Registration Number | Registration Date | Class |
|---|---|---|---|---|---|
|  | Pending | 02/04/25 | n/a | n/a | 09, 41, 42, 44, 45 |
|  | Pending | 10/17/24 | n/a | n/a | 09, 41, 42, 44, 45 |
|  | Pending | 10/17/24 | n/a | n/a | 09, 41, 42, 44, 45 |
|  | Pending | 02/04/25 | n/a | n/a | 09, 41, 42, 44, 45 |
| Home Instead | Registered | 3/14/22 | 7239088 | 12/12/23 | 41, 44, 45 |
|  | Registered | 3/24/01 | 2661894 | 12/17/02 | 43, 44 |
|  | Registered | 11/12/20 | 6564317 | 11/16/21 | 41, 44, 45 |
|  | Registered | 11/12/20 | 6564315 | 11/16/21 | 41, 44, 45 |
| TO US, IT'S PERSONAL | Registered | 4/29/21 | 7028489 | 4/18/23 | 44, 45 |

| HOME INSTEAD | Registered | 3/14/94 | 74499372 | 11/14/95 | 42, 100, 101 |
|---|---|---|---|---|---|

18.    The registrations of the Marks are currently in full force and effect, and Home Instead has given notice to the public of the registration of the Marks as provided in 15 U.S.C. § 1111.

19.    Pursuant to franchise agreements between Home Instead and its franchisees, including the Franchisee Defendants, Home Instead grants its franchisees a limited license and authority to use and display the Marks, but only in the manner prescribed by Home Instead. Franchisees may not use the Marks in connection with the sale of any services that are not authorized by Home Instead or in connection with the sale, promotion or offering of any service of any business other than their Home Instead® business.  Pursuant to the franchise agreements, franchisees are also prohibited from using Home Instead's Marks on the internet without Home Instead's consent.

20.    Home Instead has spent many millions of dollars in the United States advertising and promoting Home Instead's services.

21.    The substantial investment made in the Marks has resulted in valuable goodwill for the Marks in the United States and elsewhere and for the services being offered under those marks. Home Instead's services have been met with popular approval and, as a result of Home Instead's extensive sales,

advertising, promotion and publicity, consumers are familiar with the Marks. The services associated with the Marks are understood by the public to be marketed, sponsored, supplied by and affiliated with Home Instead.

## THE HOME INSTEAD SYSTEM

22.    Formed in 1994, Home Instead is the franchisor for the Home Instead® franchise system which, among other things, provides home care, companionship services, nurse directed care and other specialized services for older adults and other individuals who need care, utilizing Home Instead's Marks and its unique and distinctive formats, systems, standards and procedures (the "System").

23.    Home Instead, through its affiliates and franchisees, provides an effective solution for people at any point in the aging process who prefer to remain at the home of their choice where their quality of life can be enhanced without the stress and hardships of interrupted routines and daily habits.

24.    The System utilizes a care concept comprised of a certain number of integral parts, all of which are necessary for a successful operation, and which are fully described in Home Instead's confidential Operations Manual (the "Ops Manual").

25.    To carry out the home care part of the business, a Home Instead franchisee employs individuals ("Care Professionals") who are trained to provide

professional and reliable services to clients.

26.    The right and license granted to franchisees is limited to the right to provide the home care services to seniors as set forth in the Ops Manual (the "Approved Services"), which may be changed from time to time by Home Instead.

27.    Generally speaking, "Approved Services" include companionship services (such as conversation, engaging in activities, and providing social interaction), home helper services (such as meal preparation, light housekeeping, and running errands), personal care services (such as assistance with bathing, grooming, dressing, toileting, mobility, and other activities of daily living), specialized services (including Alzheimer's and dementia support, and other condition-specific support), and Approved Nurse Directed Services (services that can be performed by unlicensed personnel under the supervision of a nurse including medication administration, vital sign monitoring, and other nurse-directed tasks as permitted by law).

28.    Home Instead offers a broad range of services to its franchisees in order to monitor and assist a franchisee's compliance with Home Instead's standards. This enables Home Instead to safeguard the integrity of its brand, business, the System and the Marks. Each Home Instead franchise agreement confers upon Home Instead the right to perform this vital function.

29.    As a result of its substantial expenditures of money and effort in

developing and implementing the System, Home Instead has established a high reputation and a positive image with the public as to the quality of services provided by Home Instead and its franchisees, which reputation and image have been, and continue to be, valuable assets of Home Instead.  Home Instead strives to maintain that reputation through its careful selection of authorized franchise owners and its careful supervision over the manner and quality of its service and by strictly upholding its franchise standards.

## HOME INSTEAD'S AGREEMENTS WITH THE FRANCHISEE DEFENDANTS

### A.    The Franchise Agreements

30.    The Franchisee Defendants previously operated three Home Instead® franchised businesses (the "Franchised Businesses") pursuant to various agreements with Home Instead.

31.    Bidwell Home owned and operated two franchised Home Instead® businesses using the System and the Marks, in accordance with the terms and conditions of two franchise agreements.

32.    One of Bidwell Home's franchise agreements, dated April 1, 2016 (the "Naples Franchise Agreement"), was for the operation of a licensed Home Instead® business located in and around Naples, Florida, as specifically described in the Naples Franchise Agreement (the "Naples Territory"). A copy of the Naples Franchise Agreement is attached as Exhibit "A."

33.    Bidwell Home's other franchise agreement dated December 17, 2022 (the "Fort Myers Franchise Agreement"), was for the operation of a licensed Home Instead® business located in and around Fort Myers, Florida, as specifically described in the Fort Myers Franchise Agreement (the "Fort Myers Territory"). A copy of the Fort Myers Franchise Agreement is attached as Exhibit "B."

34.    Bidwell Service's franchise agreement, dated January 31, 2021 (the "Punta Gorda Franchise Agreement") (the Naples Franchise Agreement, Fort Myers Franchise Agreement and Punta Gorda Franchise Agreement shall be referred to collectively as the "Franchise Agreements"), was for the operation of a licensed Home Instead® business located in and around Punta Gorda, Florida, as specifically described in the Punta Gorda Franchise Agreement (the "Punta Gorda Territory") (the Naples Territory, Fort Myers Territory and Punta Gorda Territory shall be referred to collectively as the "Territories"). A copy of the Punta Gorda Franchise Agreement is attached as Exhibit "C."

35.    The Franchise Agreements expressly included certain limitations on the manner in which the Franchisee Defendants were permitted to operate their franchised Home Instead® businesses.

36.    As an initial matter, as noted above, pursuant to sections 1.A., 1.C., and 2.A. of the Franchise Agreements, the Franchisee Defendants were only permitted to provide the Approved Services from their Franchised Businesses in

each of the Territories (the "Offices"). Further establishing that the Franchisee Defendants were not allowed to permit any other businesses to operate from their Offices, section 2.A. of the Franchise Agreements states that "Franchisee must select and open the Office to exclusively operate the Franchised Business at a location approved by [Home Instead] within the Exclusive Area."

37.    Similarly, section 9.C. of the Franchise Agreements confirmed that the Franchisee Defendants could use the Offices, and the phone numbers associated with their Franchised Businesses, solely in connection with their Home Instead Franchised Businesses. That section states:

> Franchisee agrees that the [Office] which it occupies, the equipment located [on the premises], and[] the telephone numbers [used] by the Franchised Business will not be used for any purpose other than the operation of a Home Instead . . .  Business in compliance with this Franchise Agreement, and that Franchisee's use of the [Office], the equipment located therein, and/or the telephone numbers utilized by the Franchised Business for any other purpose, including . . . to operate or engage in any activities relating to the operation of a business other than a Home Instead . . . Business, is a material default of this Franchise Agreement.

38.    Section 1.C. of the Franchise Agreements expressly prohibited the Franchisee Defendants from soliciting sales to customers or from providing services to customers outside of the Territories.

39.    The Franchise Agreements are also all very clear that the Franchisee Defendants were not permitted to use Home Instead's Marks for any purpose other than in connection with the operation of the Franchised Businesses and the

Franchisee Defendants acknowledged and agreed that any unauthorized use of the Marks would constitute infringement. In that regard, section 5.A. of the Franchise Agreements state:

> Franchisee acknowledges that Franchisee has no interest or ownership rights whatsoever in or to the Licensed Marks and that Franchisee's right to use the Licensed Marks is derived solely from the Franchise Agreement and is limited to the conduct of its Franchise Business pursuant to and in compliance with this Franchise Agreement and all applicable specifications, standards and operating procedures prescribed by Franchisor during the Term. Any unauthorized use of the Licensed Marks by Franchisee constitutes an infringement of the rights of Franchisor in and to the Licensed Marks.

40.    The Franchise Agreements and the Ops Manual, moreover, prohibit the Franchisee Defendants from using the Marks as part of any domain name. Specifically, the Ops Manual and the Franchise Agreements state that Franchisee must not use any of the Marks as part of any corporate name, trade name, or domain name or with any prefix, suffix, or other modifying words, terms, designs or symbols, or in any modified form.

41.    Making plain that the Franchisee Defendants were not permitted to use the Marks in connection with any other business, the Franchise Agreements also state in section 5.B. that the Franchisee Defendants may not use the Marks "in the sale, promotion or offering of any product or service of any business in which the Franchisee or any of its Principals has a direct or indirect ownership interest for themselves or through, on behalf of, or in connection with any other person,

persons, partnership, limited liability company, corporation or other entity or arrangement."

42.     Section 5.B. of the Franchise Agreements goes on to prohibit the Franchisee Defendants from giving "third parties . . . the right or authority to use any Licensed Mark in any other manner not expressly authorized in writing" by Home Instead.

43.     In exchange for the right to use Home Instead's Marks and System, in section 8.B. the Franchisee Defendants agreed to pay certain fees to Home Instead, including five percent of their Gross Sales ("Royalties").

44.     The Franchisee Defendants specifically agreed in section 8.I. of the Franchise Agreements that they were not permitted to withhold payment of, among other things, any Royalties.

45.     As explained in section 8.D., in connection with the Franchisee Defendants' payment of royalties, they were required to provide a royalty fee report (a "Royalty Report") itemizing the Gross Sales for the previous reporting period.

46.     In addition to being obligated to pay Royalties, pursuant to section 11.A. of the Franchise Agreements, the Franchisee Defendants were obligated to contribute to Home Instead's marketing fund (the "Marketing Fund") in an amount equal to up to two percent of Gross Sales.

47.    The Franchise Agreements include a robust section dealing with the protection of Home Instead's confidential information and trade secrets. Generally speaking, the Franchise Agreements prohibited the Franchisee Defendants and those employed by them from using Home Instead's confidential information and trade secrets, including customer lists for anything other than the Home Instead business or disclosing such information to third parties except under limited circumstances.  In pertinent part, section 6.A. and 6.B. of the Franchise Agreements state:

> Franchisor possess certain confidential information including methods, techniques, formats, specifications, procedures, information including valuable Trade Secrets, systems and knowledge of and experience in the operation and franchising of . . . Home Instead . . . Business[es] ("Confidential Information"). . . .
>
> Franchisee . . . acknowledges and agrees that it will not acquire any interest in the Confidential Information, other than the right to utilize it in the development and operation of the Franchised Business during the Term and any Renewal Term, and that the use or duplication of the Confidential Information in any other business would constitute an unfair method of competition. Franchisee  . . . acknowledges and agrees that the Confidential Information is proprietary information . . .  and is disclosed to Franchisee . . . solely on the condition that Franchisee agrees, and Franchisee does agree, that it: (1) will not use the Confidential Information in any other business or capacity; (2) will maintain the absolute confidentiality of the Confidential Information during and after the Term; (3) will not make unauthorized copies of any portion of the Confidential Information disclosed in written or electronic form; and (4) will adopt and implement all reasonable procedures prescribed by Franchisor to prevent unauthorized use or disclosure of the Confidential Information, including restrictions on disclosures to employees of the Franchised Business. Franchisee is required to and does hereby agree

to require all the Franchisee's managers and office employees to sign non-solicitation and non-compete agreements, unless prohibited by . . . . applicable law or regulation. Franchisee is also required to and does hereby agree to require all Franchisee's employees to sign a confidentiality agreement. In addition, Franchisee agrees that it will not disclose Confidential Information to any third party, including . . . a third party vendor, unless and until such third party has signed an appropriate confidentiality agreement agreeing, among other things, that such party will maintain the absolute confidentiality of all Confidential Information disclosed to such party by Franchisee, its Principals, managers, agents or employees. Franchisee acknowledges and agrees that all of the Confidential Information it now has access to or obtains in the future concerning the System and the methods of operation and the concepts and methods of promoting the Franchised Business are derived from Franchisor pursuant to this Franchise Agreement, and Franchisee [and its] Principals shall not, without the written consent of Franchisor, disclose such information or use it for Franchisee's or Principals' own benefit, except to operate the Franchised Business during the Term and any Renewal Term . . .

48.    The definition of "Trade Secrets" in the Franchise Agreements includes "lists of customers."

49.    Section 6 of the Franchise Agreements contains clear in-term restrictive covenants, including covenants not to compete and not to divert business to competing businesses. Specifically, the Franchise Agreements prohibit the Franchisee Defendants from: (1) diverting or attempting to divert any existing or potential customers of any Home Instead business to any other competing business that focuses on seniors; (2) doing anything, directly or indirectly, that is injurious or prejudicial to the goodwill associated with the Marks and the System; and (3) owning, maintaining, engaging in, financially supporting or having a

beneficial interest in any competitive business.

50.    Leaving no doubt that the Franchisee Defendants were not permitted to operate a competing business, or any business other than the franchised Home Instead Business, from the Territories (or otherwise in violation of the restrictive covenants), section 9.H. of the Franchise Agreements states in pertinent part:

> Franchisee must at all times faithfully, honestly and diligently perform its obligations and continuously exert its best efforts to promote and enhance the operation of the Home Instead . . . Business. The person who is responsible for the day-to-day supervision of the Franchised Business (either Franchisee or a Franchisor-approved Principal or manager) must assume responsibilities for the Franchised Business on a full-time basis and must not engage in any other business or other activity, directly or indirectly, that requires any significant management, time commitments, or otherwise may conflict with Franchisee's obligations.

51.    In section 17.C. of the Franchise Agreements, the Franchisee Defendants acknowledged that pursuant to the Franchise Agreements, they would receive valuable specialized training, Trade Secrets and Confidential Information that was beyond their existing skills and experience and would provide a competitive advantage and be valuable to them in the operation of their Franchised Businesses. The Franchisee Defendants further acknowledged that gaining access to Home Instead's System, Confidential Information and Trade Secrets was one of the primary reasons why the Franchisee Defendants entered the Franchise Agreements.

52.    The Franchisee Defendants further acknowledged and agreed in the Fort Myers Franchise Agreement and the Punta Gorda Franchise Agreement that Home Instead has a legitimate business interest in, among other things, protecting against the unauthorized use or disclosure of its Confidential Information and Trade Secrets, protecting the goodwill associated with the Marks and the System and protecting itself from former franchisees engaging in unfair competition.

53.    As a result, in addition to containing in-term restrictive covenants, section 17.C of the Fort Meyers Franchise Agreement and the Punta Gorda Franchise Agreement contain post-term restrictive covenants which state that:

> In consideration for this specialized training, Trade Secrets, Confidential Information, and all rights granted to Franchisee pursuant to the Franchise Agreement, and to protect Franchisor's legitimate business interests including those listed above, Franchisee covenants that during the Term, including any Renewal Term, and for a period of two (2) years following the expiration or termination of this Franchise Agreement, Franchisee shall not directly or indirectly, for itself, or through, on behalf of, or in conjunction with any of its Principals or any other person, partnership, limited liability company, corporation or other entity or arrangement:
>
> (1) Divert, solicit, or attempt to divert any existing or potential business or customer of the Franchised Business or of any other Home Instead Business to any other business that focuses on seniors and provides services within the scope of Approved Services to seniors in their homes, by direct or indirect inducement or otherwise, unless expressly authorized to do so in writing by Franchisor;
>
> (2) Do or perform, directly or indirectly, any act injurious or prejudicial to the goodwill associated with the Licensed Marks and the System; or

(3) Own, maintain, operate, make loans to, or have any other financial or beneficial interest in (including any type of interest in any corporation, partnership, trust, limited liability company, unincorporated association, joint venture, or other entity), or advise or assist, any business that focuses on seniors and provides services within the scope of Approved Services to seniors within (i) the Exclusive Area granted to Franchisee, (ii) forty-five (45) miles of the outside border of the Exclusive Area; or (iii) the exclusive area granted to any other Home Instead Business operated by another franchisee, Franchisor or Franchisor's affiliates. Notwithstanding the foregoing, it is not a violation of this Section 17(C)(3) for Franchisee to directly or indirectly own, maintain, operate, make loans, or have any other financial or beneficial interest in another Home Instead franchised business so long as Franchisor has provided written authorization.

54.    Likewise, the Naples Franchise Agreement contains similar post-restrictive covenants that state:

In consideration for such training, Trade Secrets, Confidential Information and rights, Franchisee and each Principal covenant that commencing upon the expiration, termination, or transfer of all of Franchisee's interest in this Franchise Agreement and continuing for one (1) year thereafter, neither Franchisee, nor any of the Principals, shall directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons, partnership, limited liability company, corporation or other entity or arrangement:

1.    Divert, or attempt to convert any business or customer of any Franchised Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Licensed Marks and the System;

2.    Except as otherwise specifically permitted by the terms of this Franchise Agreement, employ, or recruit any person who is employed by Franchisor or by its affiliates or by any franchisee (including, as applicable, any developer or franchisee of Franchisor),

or otherwise directly or indirectly induce such person to leave that person's employment; or

3.      Own, maintain, operate, engage in, have any financial or beneficial interest in (including the interest in corporations, partnerships, limited liability companies, trusts, unincorporated associations or joint ventures), advise, assist or make loans to any Competitive Business (as defined above in Section 6, paragraph C (3)) that is located within or that is intended to be located within the Exclusive Area granted Franchisee within a forty-five (45) mile radius of the premises of the Franchised Business granted by this Franchise Agreement or within a forty-five (45) mile radius of the premises of the Exclusive Area.

55.      Home Instead has many legitimate business interests justifying the inclusion and enforcement of in-term and post-term restrictive covenants, including its desire to protect trade secrets and confidential business information. Home Instead also has a legitimate business interest in protecting the goodwill associated with the System and the Marks. Moreover, Home Instead has a legitimate business interest in protecting the viability of its franchise system by preventing franchisees from breaching their franchise agreements, thereby safeguarding the interests of Home Instead and of neighboring franchisees who are adversely affected by such breaches. Enforcing the non-compete provision will further protect Home Instead's ability to sell its franchises, as the existence of Defendants' unauthorized competing business in the Territories will make it more difficult or impossible to sell the territory to a replacement franchisee and will instead require Home Instead to service customers in the Territories.

56.     The Franchise Agreements' restrictive covenants are reasonably necessary to protect Home Instead's legitimate business interests. The limited duration and the limited geographical scope of the covenants are narrowly tailored and apply only to the Territories previously serviced by Franchisees, along with limited contiguous regions, many of which are occupied by other Home Instead franchisees and in some instances, the protected areas occupied by other current Home Instead franchisees.

57.     Home Instead's Trade Secrets, which include information about customers, derive economic value from not being readily ascertainable by others who can obtain economic value from their disclosure or use. Additionally, such information is the subject of reasonable efforts to maintain their secrecy, including without limitation, Home Instead's prohibition on the information being used and disclosed unless in strict conformance with the Franchise Agreement's restrictions.

58.     Section 16.B. of the Franchise Agreements set forth the grounds for the immediate termination of the Franchise Agreements upon the service of notice, including: (1) the Franchisee Defendants or any of their principals provide Approved Services from any other business or by any other entity not operated as a Home Instead business; (2) the Franchisee Defendants make any unauthorized use of the Marks; (3) the Franchisee Defendants engage in any conduct which has or which Home Instead reasonably believes will reflect materially and

unfavorably upon the operation and reputation of the System or the Marks, or the goodwill generated by or associated with them; (4) the Franchisee Defendants make any unauthorized use or disclosure of Confidential Information; or (5) the Franchisee Defendants violate any of the Franchise Agreements' restrictive covenants.

### B.    The Guaranties

59.    Pursuant to written guaranties signed by W. Bidwell and S. Bidwell contemporaneously with Bidwell Home and Bidwell Service's execution of the Franchise Agreements (separately the "Naples Guaranty," the "Fort Myers Guaranty" and the "Punta Gorda Guaranty" and collectively the "Guaranties"), W. Bidwell and S. Bidwell unconditionally guaranteed the payment and performance of each and every obligation and covenant of Bidwell Home and Bidwell Services to Home Instead under the Franchise Agreements. Copies of the Guaranties are attached as Composite Exhibit "D."

### THE FRANCHISEE DEFENDANTS' PRE-TERMINATION BREACHES

60.    During the term of the Franchise Agreements, the Franchisee Defendants breached the Franchise Agreements and Guaranties in numerous ways.

61.    Specifically, with respect to the in-term restrictive covenants, the Franchisee Defendants, along with others, including family members that also

work for the Franchised Businesses in leadership positions, established Seaside, which operates as "Seaside Home Health Care."

62. The services provided by Seaside include the exact same services that fall within the scope of Home Instead's Approved Services. Indeed, according to Seaside's own website (and even podcasts hosted by Iler-Bidwell and other individuals who work for the Franchisee Defendants' Franchised Businesses), it advertises and provides meal preparation, light cleaning, medication reminders, companionship and transportation (the "Seaside Services"). A chart comparing the Approved Services and the Seaside Services is below:

| Home Instead's Approved Services (as set forth in Operations Manual) | Seaside's Services (as advertised on its website) |
|---|---|
| Meal Preparation | Meal Preparation |
| Household Duties / Light Cleaning | Household Duties / Light Cleaning |
| Companionship | Companionship |
| Medication Reminders / Chronic Condition Management or Support | Medication Reminders / Chronic Condition Management or Support |
| Transportation Services | Transportation Services |
| Dementia Care / Alzheimer's Support | Dementia Care / Alzheimer's Support |
| Hospice Care Support (referred to as End-of-Life Care) | Hospice Care Support / End-of-Life Care |
| 24-Hour Care | 24-Hour Care |
| In-Home Support for Chronic Conditions (e.g., heart disease, diabetes, arthritis) | In-Home Support for Chronic Conditions (e.g., heart disease, diabetes, arthritis) |
| Respite Care | Respite Care |
| Nurse Directed Services (NDS) includes medication administration, which is broader than medication reminders | Medication Management |
| NDS includes wound care and dressing | Wound Dressing |

| Pain Management and Education | Pain Management and Education |
|---|---|
| NDS includes IV medication/fluid administration if delegated and licensed | IV Therapy |

63.     The overlap between the Franchisee Defendants' Franchised Businesses and Defendants' competing Seaside business was not limited to the offering and provision of the same services. To the contrary, the Franchisee Defendants' Franchised Business and Seaside operate out of the same Offices, use the same phone numbers, use the same individuals to field calls from prospective customers, and offer Care Professionals who provide Approved Services to both their Home Instead and Seaside customers.

64.     The disclosed officers of Seaside, J. Bidwell and Iler-Bidwell. J. Bidwell and Iler-Bidwell (W. Bidwell and S. Bidwell's son and daughter-in-law) were, before the Franchise Agreements were terminated, the Franchisee Defendants' general managers for all three Territories.

65.     Likewise, W. Bidwell and S. Bidwell's son-in-law, William Datillo, is involved in both businesses, serving as a Client Care Manager for the Franchisee Defendants' Home Instead Businesses and as Chief Financial Officer for Seaside.

66.     Marisa Miller, who is a Home Care Manager for the Franchisee Defendants' Home Instead businesses also purports to be the "Director of Development" for Seaside.

67.     Individuals employed by Seaside are also using credentials associated

23

with the Franchisee Defendants' Home Instead businesses to access Home Instead's required operational software system, called WellSky, and Home Instead's other proprietary systems.

68.    In violation of the Franchise Agreements and the Lanham Act, when receiving calls on Home Instead telephone numbers, which are tied to Home Instead's marketing efforts on, among other things, Google, Defendants, including the Franchisee Defendants' own representatives, have solicited prospective customers on behalf of Seaside. This conduct is designed to deceive prospective consumers in a classic bait-and-switch scam.

69.    For example, when prospective customers call the telephone numbers associated with the Franchisee Defendants' franchised Home Instead Businesses, Defendants will either answer the call as "Home Instead," only to eventually steer the prospective customer into using the services of Seaside, including those that fall within the scope of Home Instead's Approved Services or, on other occasions, Defendants will simply answer the call and identify themselves as "Seaside" and then attempt to sell Seaside's services, including those that fall within the scope of Home Instead's Approved Services, without any mention of Home Instead.

70.    Defendants are not shy about confirming during phone conversations and in-person visits that Seaside performs the same services as Home Instead.

71.    Notably, Home Instead's discovery of Defendants' wrongful conduct

through Home Instead's review of recorded phone calls should not be a surprise to Defendants. Indeed, section 9.L. of the Franchise Agreements, entitled "No Privacy Expectation" makes clear that "Franchisee shall have no expectation of privacy with respect to any email accounts" and that "to ensure that Franchisee is maintaining Franchisor's quality of service in the operation of the Franchised Business, Franchisor may record, monitor and evaluate telephone calls made to or arising from the Franchised Business."

72.    Defendants specifically "consent[ed] to such monitoring, recording and evaluation and [had] no expectation of privacy with respect to the phone calls made to or arising from the Franchised Business."

73.    As the Defendants know, calls made to the phone numbers displayed on the Franchisee Defendants' Franchised Businesses' Home Instead website and other digital platforms provided or managed by Home Instead are routed through, and recorded by, a system known as "Invoca."

74.    Defendants' bait and switch tactics extend beyond the use of the phone numbers displayed on the Franchisee Defendants' Home Instead business web site to solicit customers for the competing Seaside business. In furtherance of their scheme to use the goodwill associated with Home Instead and its Marks, Defendants have registered and operate the domain www.homeinsteadswfl.com, which appears to be associated with Home Instead, but when that URL is accessed,

consumers are automatically re-directed to Seaside's website, www.seasidehomehealthcare.com.

75.    If that were not enough, the Franchisee Defendants changed the name on their Home Instead® Google Business Profiles for all three territories to Seaside. As a result, the positive reviews from customers they serviced under the Home Instead brand, including some dating back at least seven years, now appear as belonging to Seaside on Google Business Profiles for Seaside. As a result, all of the favorable reviews, including some dating back at least seven years when the profiles were listed as "Home Instead," now appear under Seaside's Google Business Profiles.

76.    For example, the image below shows the former Home Instead Fort Myers Google Business Profile after its conversion to Seaside, highlighting a review from a former Home Instead client.



77.    Not only does this conduct hurt Home Instead and deprive Home

Instead of Royalties and Marketing Fund contributions associated with the services that should be performed by the Franchisee Defendants as part of their "Home Instead" businesses, but it also damages other nearby franchisees. Despite that franchisees are obligated by the Ops Manual to refer business outside of their territory to a Home Instead® franchisee that serves the territory where a prospective customer is located, Defendants are referring customers needing services that fall within Home Instead's Approved Services to Seaside, instead of to neighboring Home Instead franchisees.

78.     Ultimately choosing to simply ignore their contractual obligations to Home Instead, the Franchisee Defendants have breached the Franchise Agreements by: (1) using the Marks for purposes other than in connection with the Franchised Businesses; (2) impermissibly using the Marks on the internet, including in connection with a website URL designed to direct consumers attempting to access a Home Instead website to Defendants' Seaside business; (3) operating a business, other than the Franchised Businesses, out of the Offices and not dedicating best efforts to the Home Instead Franchised Businesses; (4) using the phone numbers associated with the Franchised Businesses for other businesses, including Defendants' Seaside business; (5) failing to provide to Home Instead complete and accurate Royalty Reports based on the Franchisee Defendants' failure to account for business that was improperly diverted to

Defendants' competing Seaside business; (6) failing to pay the full amount owed for Royalties due to the failure to account for business that was improperly diverted to Defendants' competing Seaside business; (7) failing to pay the full amount owed to the Marketing Fund due to the failure to account for business that was improperly diverted to Defendants' competing Seaside business; (8) improperly disclosing and using Home Instead's Confidential Information and Trade Secrets; and (9) violating the in-term restrictive covenants by, among other things, diverting customers to Defendants' competing Seaside business in and outside the Territories.

## THE TERMINATION OF THE FRANCHISE AGREEMENTS

79.     By letter dated August 20, 2025, Home Instead notified the Franchisee Defendants of their incurable defaults under and the termination of the Franchise Agreements (the "Termination Notice").

80.     The Franchise Agreements clearly identify the Franchisee Defendants' obligations upon the termination of the Franchise Agreements. Specifically, upon the termination of the Franchise Agreements, section 17.A. requires the Franchisee Defendants to, among other things immediately cooperate with Home Instead to wind-down their franchised business, including transitioning ongoing care of clients to another business as directed by Home Instead and comply with all post-term restrictive covenants, including the

covenant not to compete.

## LIKELIHOOD OF CONSUMER CONFUSION AND DECEPTION

81.    Defendants' use and display of the Marks in connection with Seaside is without Home Instead's license or consent. Upon seeing the familiar Marks, through Defendants' unauthorized use thereof, consumers have been and will continue to be deceived into concluding that the competing Seaside business operated by Defendants is sponsored or endorsed by Home Instead and use the Marks pursuant to Home Instead's authority and permission. Such impressions will have a material influence on customers' purchasing decisions, as well as Home Instead's goodwill and reputation.

82.    W. Bidwell, through the operation of his companies Bidwell Home and Bidwell Service and acting as an owner and officer of those companies, has actively and knowingly impermissibly used the Marks both before and after the termination of the Franchise Agreements. W. Bidwell directs and controls the operation of Bidwell Home and Bidwell Service (and may be an undisclosed controlling officer of Seaside) and is responsible for marketing, which includes the unauthorized use of the Marks. W. Bidwell actively and knowingly caused the unlawful use of the Marks and personally took part in the infringing use of the Marks through, among other things, his decision to wrongfully use the Marks in connection with the Seaside business.

83.    S. Bidwell, through the operation of her companies Bidwell Home and Bidwell Service and acting as an owner and officer of those companies, has actively and knowingly impermissibly used the Marks both before and after the termination of the Franchise Agreements. S. Bidwell directs and controls the operation of Bidwell Home and Bidwell Service (and may be an undisclosed controlling officer of Seaside) and is responsible for marketing, which includes the unauthorized use of the Marks. S. Bidwell actively and knowingly caused the unlawful use of the Marks and personally took part in the infringing use of the Marks through, among other things, her decision to wrongfully use the Marks in connection with the Seaside business.

84.    J. Bidwell, through the operation of his company Seaside, and acting as an owner and officer of that company, has actively and knowingly impermissibly used the Marks in connection with his Seaside business. J. Bidwell directs and controls the operation of Seaside and is responsible for marketing, which includes the unauthorized use of the Marks. J. Bidwell actively and knowingly caused the unlawful use of the Marks and personally took part in the infringing use of the Marks through, among other things, his decision to wrongfully use the Marks in connection with the Seaside business.

85.    Iler-Bidwell, through the operation of her company Seaside, and acting as an owner and officer of that company, has actively and knowingly

impermissibly used the Marks in connection with her Seaside business. Iler-Bidwell directs and controls the operation of Seaside and is responsible for marketing, which includes the unauthorized use of the Marks. Iler-Bidwell actively and knowingly caused the unlawful use of the Marks and personally took part in the infringing use of the Marks through, among other things, her decision to wrongfully use the Marks in connection with the Seaside business.

86.    By reason of the foregoing, Home Instead has suffered damages, in an amount presently unknown yet substantial.

87.    Home Instead will suffer serious, immediate, and irreparable harm if Defendants' willful infringement of the Marks and violation of the Franchise Agreements' restrictive covenants are not immediately enjoined. Home Instead's goodwill and reputation will suffer by virtue of the public's identification of Home Instead with the services being offered by Defendants, which utilize Home Instead's Marks.

88.    Defendants' use of the Marks in connection with their competing business poses an immediate threat to the distinct and exclusive image Home Instead has created at great expense for its franchisees.

89.    Home Instead has performed all of its obligations under the Franchise Agreements.

90.    The Franchisee Defendants have agreed in writing that in litigation to

enforce the terms of the agreements between Home Instead and the Franchisee Defendants, Home Instead, as the prevailing party, shall be paid by the Franchisee Defendants all costs, including attorneys' fees, incurred as a result.

91.    Home Instead has engaged the undersigned counsel and has agreed to pay counsel reasonable attorneys' fees for all services rendered in this action and otherwise in connection with enforcing the agreements between Home Instead and the Franchisee Defendants.

92.    All conditions precedent to the institution of this action have been satisfied, discharged, excused and/or waived.

## COUNT I
### LANHAM ACT INFRINGEMENT AGAINST DEFENDANTS

93.    Home Instead re-alleges and incorporates Paragraphs 1 through 92 above as if fully set forth herein.

94.    Defendants' acts constitute infringements of Home Instead's registered trademarks and service marks in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

## COUNT II
### LANHAM ACT FALSE DESIGNATIONS AGAINST DEFENDANTS

95.    Home Instead re-alleges and incorporates Paragraphs 1 through 92 above as if fully set forth herein.

96.    Defendants' acts constitute false designations of origin in violation of

Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

## COUNT III
## COMMON LAW TRADEMARK INFRINGEMENT AGAINST DEFENDANTS

97.     Home Instead re-alleges and incorporates Paragraphs 1 through 92 above as if fully set forth herein.

98.     Defendants' acts constitute unlawful trademark and service mark infringements under the common law.

## COUNT IV
## COMMON LAW UNFAIR COMPETITION AGAINST DEFENDANTS

99.     Home Instead re-alleges and incorporates Paragraphs 1 through 92 above as if fully set forth herein.

100.     Defendants' acts constitute unfair competition under the common law.

## COUNT V
## BREACH OF NAPLES FRANCHISE AGREEMENT
## AGAINST BIDWELL HOME

101.     Home Instead re-alleges and incorporates Paragraphs 1 through 92 above as if fully set forth herein.

102.     Bidwell Home breached the Naples Franchise Agreement by: (1) using the Marks for purposes other than in connection with the Franchised Businesses; (2) impermissibly using the Marks on the internet, including in

connection with a web address designed to direct consumers attempting to access a Home Instead website to Defendants' Seaside business; (3) operating something other than the Franchised Businesses out of the Offices and not dedicating best efforts to the Home Instead Franchised Businesses; (4) using the phone numbers associated with the Franchised Businesses for other businesses, including Defendants' Seaside business; (5) failing to provide to Home Instead complete and accurate Royalty Reports based on the Franchisee Defendants' failure to account for business that was improperly diverted to Defendants' competing Seaside business; (6) failing to pay the full amount owed for Royalties due to the failure to account for business that was improperly diverted to Defendants' competing Seaside business; (7) failing to pay the full amount owed to the Marketing Fund due to the failure to account for business that was improperly diverted to Defendants' competing Seaside business; (8) improperly disclosing and using Home Instead's Confidential Information and Trade Secrets; and (9) violating the in-term restrictive covenants.

103.    These breaches have directly and proximately caused loss and damage to Home Instead.

## COUNT VI
## BREACH OF NAPLES GUARANTY AGAINST
## W. BIDWELL AND S. BIDWELL

104.    Home Instead re-alleges and incorporates Paragraphs 1 through 92

34

and 102 through 103 above as if fully set forth herein.

105.    Pursuant to the Naples Guaranty, W. Bidwell and S. Bidwell unconditionally and irrevocably guaranteed the performance of each and every obligation, liability and covenant of Bidwell Home to Home Instead under the Naples Franchise Agreement.

106.    The failure of W. Bidwell and S. Bidwell to ensure Bidwell Home's compliance with its obligations under the Naples Franchise Agreement constitute breaches of the Naples Guaranty.

107.    These breaches have directly and proximately caused loss and damage to Home Instead.

**COUNT VII**
**BREACH OF FORT MYERS FRANCHISE AGREEMENT**
**AGAINST BIDWELL HOME**

108.    Home Instead re-alleges and incorporates Paragraphs 1 through 92 above as if fully set forth herein.

109.    Bidwell Home breached the Fort Myers Franchise Agreement by: (1) using the Marks for purposes other than in connection with the Franchised Businesses; (2) impermissibly using the Marks on the internet, including in connection with a web address designed to direct consumers attempting to access a Home Instead website to Defendants' Seaside business; (3) operating something other than the Franchised Businesses out of the Offices and not dedicating best

efforts to the Home Instead Franchised Businesses; (4) using the phone numbers associated with the Franchised Businesses for other businesses, including Defendants' Seaside business; (5) failing to provide to Home Instead complete and accurate Royalty Reports based on the Franchisee Defendants' failure to account for business that was improperly diverted to Defendants' competing Seaside business; (6) failing to pay the full amount owed for Royalties due to the failure to account for business that was improperly diverted to Defendants' competing Seaside business; (7) failing to pay the full amount owed to the Marketing Fund due to the failure to account for business that was improperly diverted to Defendants' competing Seaside business; (8) improperly disclosing and using Home Instead's Confidential Information and Trade Secrets; and (9) violating the in-term restrictive covenants.

110.    These breaches have directly and proximately caused loss and damage to Home Instead.

## COUNT VIII
## BREACH OF FORT MYERS GUARANTY AGAINST
## W. BIDWELL AND S. BIDWELL

111.    Home Instead re-alleges and incorporates Paragraphs 1 through 192 and 109 through 110 above as if fully set forth herein.

112.    Pursuant to the Fort Myers Guaranty, W. Bidwell and S. Bidwell unconditionally and irrevocably guaranteed the performance of each and every

obligation, liability and covenant of Bidwell Home to Home Instead under the Fort Myers Franchise Agreement.

113.    The failure of W. Bidwell and S. Bidwell to ensure Bidwell Home's compliance with its obligations under the Fort Myers Franchise Agreement constitute breaches of the Fort Myers Guaranty.

114.    These breaches have directly and proximately caused loss and damage to Home Instead.

## COUNT IX
## BREACH OF PUNTA GORDA FRANCHISE AGREEMENT
## AGAINST BIDWELL SERVICE

115.    Home Instead re-alleges and incorporates Paragraphs 1 through 92 above as if fully set forth herein.

116.    Bidwell Service breached the Punta Gorda Franchise Agreement by: (1) using the Marks for purposes other than in connection with the Franchised Businesses; (2) impermissibly using the Marks on the internet, including in connection with a web address designed to direct consumers attempting to access a Home Instead website to Defendants' Seaside business; (3) operating something other than the Franchised Businesses out of the Offices and not dedicating best efforts to the Home Instead Franchised Businesses; (4) using the phone numbers associated with the Franchised Businesses for other businesses, including Defendants' Seaside business; (5) failing to provide to Home Instead complete and

accurate Royalty Reports based on the Franchisee Defendants' failure to account for business that was improperly diverted to Defendants' competing Seaside business; (6) failing to pay the full amount owed for Royalties due to the failure to account for business that was improperly diverted to Defendants' competing Seaside business; (7) failing to pay the full amount owed to the Marketing Fund due to the failure to account for business that was improperly diverted to Defendants' competing Seaside business; (8) improperly disclosing and using Home Instead's Confidential Information and Trade Secrets; and (9) violating the in-term restrictive covenants.

117.    These breaches have directly and proximately caused loss and damage to Home Instead.

## COUNT X
### BREACH OF PUNTA GORDA GUARANTY AGAINST W. BIDWELL AND S. BIDWELL

118.    Home Instead re-alleges and incorporates Paragraphs 1 through 92 and 116 through 117 above as if fully set forth herein.

119.    Pursuant to the Punta Gorda Guaranty, W. Bidwell and S. Bidwell unconditionally and irrevocably guaranteed the performance of each and every obligation, liability and covenant of Bidwell Home to Home Instead under the Fort Punta Gorda Franchise Agreement.

120.    The failure of W. Bidwell and S. Bidwell to ensure Bidwell Home's

compliance with its obligations under the Punta Gorda Franchise Agreement constitute breaches of the Punta Gorda Guaranty.

121.    These breaches have directly and proximately caused loss and damage to Home Instead.

## DEMAND FOR ATTORNEYS' FEES AND COSTS

The agreements at issue in this litigation provide that the Franchisee Defendants shall pay Home Instead all damages, costs and expenses, including reasonable attorneys' fees, incurred by Home Instead in connection with enforcement of the Franchise Agreements.  Home Instead hereby demands that it be reimbursed by the Franchisee Defendants for all costs and expenses (including attorneys' fees) relating to prosecution of this action. Home Instead further demands that it be reimbursed by all Defendants for all costs and expenses (including attorneys' fees) relating to Home Instead's Lanham Act claims.

## REQUEST FOR RELIEF

WHEREFORE, Home Instead, Inc. demands judgment against Defendants Bidwell Home Care Services, LLC, Bidwell Service Care, LLC, William Bidwell, Susan Bidwell, Bidwell Care Holdings, Inc., Joseph Bidwell and Audra Iler-Bidwell for:

1.    Preliminary and permanent injunctions enjoining Defendants and all persons acting on their behalf, in concert with, or under their control from, in

connection with Seaside:

(a)    selling, advertising, displaying, or promoting any product or service bearing any of the Marks;

(b)    holding themselves out as an operator of a Home Instead franchise or having any connection with Home Instead or the System; and

(c)    making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Defendants and the products and services provided by Defendants, are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized, or approved by Home Instead.

2.    Preliminary and permanent injunctions enjoining all Defendants, and all persons acting on their behalf, in concert with, or under their control, from:

(a)    for a period of 2 years commencing on the date that this Court enters an injunction, diverting, soliciting, or attempting to divert any existing or potential business or customer of the Franchisee Defendants' Franchised Businesses or of any Home Instead Business to any other business, including without limitation, Seaside, that focuses on seniors and provides services within the scope of Approved Services to seniors in their homes, by direct inducement or otherwise;

(b)    for a period of 2 years commencing on the date that this Court

enters an injunction, doing or performing, directly or indirectly, any act injurious or prejudicial to the goodwill associated with the Marks and the System; and

(c)     for a period of 2 years commencing on the date that this Court enters an injunction, owning, maintaining, operating, making loans to, or having any other financial or beneficial interest in (including any type of interest in any corporation, partnership, trust, limited liability company, unincorporated association, joint venture, or other entity), or advise or assist, or allow the use of the Offices for, any business that focuses on seniors and provides services within the scope of Approved Services[1] to seniors within (i) the Exclusive Areas (as defined by the Franchise Agreements) granted to the Franchisee Defendants; (ii) forty-five (45) miles of the outside border of the Exclusive Areas; or (iii) the exclusive area granted to any other Home Instead Business operated by another franchisee, Home Instead or Home Instead's affiliates.

3.     Preliminary and permanent injunctions directing the Franchisee Defendants to:

(a)     immediately refrain from onboarding any new clients to the Franchised Businesses and referring any prospective new clients to a neighboring

---

[1] Home Instead is not seeking an injunction to prevent Defendants from performing services that do not fall within Home Instead's Approved Services, such as skilled home health care.

Home Instead franchisee in accordance with the requirements of the Franchise Agreements;

(b)    immediately refrain from onboarding any new clients to Seaside in order to offer any services that fall within the scope of Home Instead's Approved Services and refer any prospective client inquiries to a neighboring Home Instead owner in accordance with the requirements of the Franchise Agreements;

(c)    immediately maintain and refrain from deleting or improperly altering any documents used to operate the Franchised Businesses;

(d)    immediately refrain from using Home Instead's Marks and Systems for any purpose other than to the extent necessary to support the transition during Transition Period;

(e)    immediately comply with all restrictions relating to Confidential Information and Trade Secrets contained in the Franchise Agreements; and

(f)    immediately cooperate with Home Instead in connection with the wind-down of the Franchisee Defendants' Franchised Business including transitioning ongoing care of clients to one or more other businesses that focus on seniors and provide services within the scope of Approved Services to seniors in their homes as directed by Home Instead until all clients have transitioned care to Home Instead or such clients have elected to seek care from providers other than Home Instead or Defendants (the "Transition Period") by:

(i)    making all necessary and appropriate filings with the Florida Agency for Health Care Administration in connection with the transfer of care for the Existing Clients from the Defendants to Home Instead by August 29, 2025;

(ii)    ensuring that all records relating to the Home Instead Clients, including information regarding the associated caregiver employees serving the Home Instead Clients, are properly included within the Franchisee Defendants' WellSky account and refraining from deleting such information, with confirmation of such provided to Home Instead by August 27, 2025;

(iii)    taking all necessary steps to provide to Home Instead a list of all Home Instead Clients and all documents and records relating to the provision of care to such Home Instead Clients including, without limitation, care plans, care notes, client service agreements, schedule information, and contact information for the Home Instead Clients and/or their authorized representatives, to the extent that such information is not already in the Franchisee Defendants' WellSky account by August 27, 2025;

(iv)    providing to Home Instead a list of any caregiver employees that are providing services to Home Instead Clients to the extent that they are not already identified in the Franchisee Defendants' WellSky account by August 27, 2025;

(v)    cooperating with Home Instead in communicating with Home Instead Clients and caregiver employees regarding the transition of care as appropriate throughout the Transition Period;

(vi)    transferring to Home Instead all phone numbers used by the Franchisee Defendants to solicit or communicate with third parties (including clients, prospective clients and referral sources) in connection with the Franchised Businesses other than to the extent necessary to support the transition during Transition Period by August 29, 2025;

(vii)    refraining from accessing Home Instead's systems and platforms including, without limitation, Salesforce, Zeewise, Invoca, Microsoft 365, Empower, and MyFranchise) other than as strictly necessary to provide services to Home Instead Clients and to comply with all post-term obligations during the Transition Period;

4.    Preliminary and permanent injunctions directing Seaside and all persons acting on its behalf, in concert with it, or under its control to:

(a)    immediately cease to use, in any manner whatsoever, any confidential methods, computer software, procedures and techniques associated with the System;

(b)    immediately deliver to Home Instead all software or programs licensed to the Franchisee Defendants by Home Instead or its designees, along

with all Customer Data, records, files, correspondence, agreements, invoices and any and all other materials relating to Seaside's provision of services that fall within the scope of Home Instead's Approved Services;

(c)    immediately facilitate the transition of care for all Seaside clients to the extent that they are receiving from Seaside services that fall within the scope of Home Instead's Approved Services (the "Covered Seaside Clients") to a Home Instead franchisee identified by Home Instead; and

(d)    account and pay over to Home Instead all gains, profits, and advantages derived by Defendants from any trademark and service mark infringement and unfair competition to the fullest extent provided by Section 35 of the Lanham Act, 15 U.S.C. § 1117 and by the controlling principles of common law.

5.    Money damages, plus three times additional actual damages Home Instead has sustained by reason of Defendants' trademark and service mark infringement and unfair competition, pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

6.    Punitive damages because of the willful nature of Defendants' actions;

7.    Pre-judgment interest and Home Instead's reasonable attorneys' fees and costs incurred in protecting its rights in this action in accordance with the

terms of the Franchise Agreements and because of the willful nature of the infringement, pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

8.    Compensatory damages, lost profits, and attorneys' fees and costs against Defendants due to their breaches of the agreements and their wrongful conduct;

9.    An order directing Defendants to file with the Court, and to serve on Home Instead's counsel within ten days after service of any injunction or order issued herein, or within such a reasonable time as the Court shall direct, a report, in writing and under oath, setting forth in detail the manner in which Defendants have complied with such injunction or order;

10.    All costs, disbursements, and expenses of this action; and

11.    All such other relief as this Court may deem just and proper.

Dated: August 21, 2025                    Respectfully submitted,


                                         _/s/ Aaron S. Blynn_____
                                         Michael D. Joblove, Esq.
                                         Florida Bar No.: 354147
                                         mdjoblove@venable.com
                                         Aaron S. Blynn, Esq.
                                         Florida Bar No.: 073464
                                         asblynn@venable.com
                                         VENABLE LLP
                                         801 Brickell Avenue, Suite 1500
                                         Miami, Florida 33131
                                         Telephone:   (305) 349-2300
                                         Facsimile:    (305) 349-2310
                                         *Attorneys for Home Instead, Inc.*